*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* I. GORDON, Minor.

UNPUBLISHED
August 04, 2026
9:56 AM

No. 377942
Washtenaw Circuit Court
Family Division
LC No. 22-000051-NA

Before: GADOLA, C.J., and RIORDAN and LETICA, JJ.

PER CURIAM.

Respondent-father (father) appeals by right the trial court's order terminating his parental rights to IG, the minor child. Father argues that the trial court erred by finding that the Michigan Department of Health and Human Services (DHHS) made reasonable efforts to reunify him with IG, that the court erred by finding that termination was warranted under MCL 712A.19b(3)(h),[1] and that the court erred by finding that termination of his parental rights was in IG's best interests. We agree that DHHS failed to make reasonable efforts to reunify him with IG, vacate the trial court's order terminating father's parental rights, and remand for further proceedings consistent with this opinion.[2]

---

[1] In pertinent part, MCL 712A.19b provides:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

> * * *

> (h) The parent is imprisoned for such a period that the child will be deprived of a normal home for a period exceeding 2 years, and the parent has not provided for the child's proper care and custody, and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

[2] In light of our disposition, we decline to address father's remaining issues.

## I. RELEVANT FACTS

In July 2022, when IG was born, father and respondent-mother (mother) were jailed after being charged with murdering a male acquaintance in January 2022, by stabbing him over 100 times. Mother had mental-health issues,[3] and, initially, planned to give IG up for adoption; however, she stopped that process. Moreover, mother did not identify father as IG's father. Instead, she offered IG's maternal grandmother as a potential placement, but the grandmother declined. Mother offered no other plan to care for IG. Therefore, DHHS filed an initial petition asking the trial court to exercise jurisdiction over IG and remove her from mother's care. The court issued the petition and placed IG in foster care.

By November 2022, DHHS reported that it may have located IG's putative father. The court then ordered DHHS to contact him and pay for a DNA test. In December 2022, the caseworker spoke with jail personnel about the DNA test. In January 2023, the worker received a "[n]o-show report that the DNA was missed[.]"

In March 2023, the caseworker met with father in jail and explored placement options with his family. Father offered IG's paternal grandfather as a potential placement; however, the paternal grandfather declined placement until the DNA was completed.

In May 2023,[4] DNA testing established father was IG's biological father. Father also wanted to establish himself as IG's legal father. After a follow-up call by the caseworker to the prison on February 12, 2024, father signed an affidavit of parentage (AOP) the following day. Although the caseworker received the AOP a month later, mother did not sign it until July 2024. DHHS attributed the delays in completing the AOP to father's failure to sign the AOP despite the caseworker twice mailing it to him with return envelopes, mother's incarceration and mental health issues, and interactions with the Michigan Department of Corrections (MDOC).

In the interim, the caseworker also located IG's paternal grandmother in California. The paternal grandmother expressed interest in placement and came to Michigan to visit IG twice in July 2023. Paternal grandmother reported that she and father had not had a relationship for five years. Upon learning that paternal grandmother was in Michigan, maternal grandmother, who had been consistently visiting IG in her foster care placement after declining placement, also asked DHHS to place IG with her. After further conversation with the caseworker, the paternal grandmother's stated goal was to keep IG out of foster care, and the paternal grandmother was "fine" if IG was placed with her maternal grandmother.

In October 2023, mother pleaded no contest to second-degree murder, MCL 750.317, in the criminal case and was sentenced to 25 to 50 years' imprisonment in January 2024. In November 2023, a jury convicted father of second-degree murder and unlawfully driving away an automobile (UDAA), MCL 750.413, in the criminal case. In January 2024, father was initially sentenced to concurrent terms of 37 to 60 years' imprisonment for the murder and 5 years'

---

[3] The court appointed a guardian ad litem for mother as well as an attorney.

[4] In part the delay in securing father's DNA occurred because the jail had a lock down.

imprisonment for the UDAA. Three months later, father was resentenced on the UDAA to 702 days in jail with credit for time served.

DHHS learned that mother had accepted a plea in her criminal case to a term that would result in her incarceration for years after IG reached adulthood. DHHS then recommended a goal change from reunification with mother to adoption. Additionally, in April 2024, IG was moved from foster care to a placement with her maternal grandmother and step-grandfather.

At a March 2024 review hearing for mother, the caseworker reported difficulty scheduling visits between IG and mother. Moreover, the caseworker needed clarification on whether to move forward with guardianship or adoption as the goal. Mother desired a guardianship but the maternal grandparents preferred adoption. Mother's attorney confirmed that mother favored guardianship because MDOC policy did not allow visitation between a parent and child after the parent's rights to that child had been terminated. Nevertheless, MDOC's policy permitted visitation between the prisoner and immediate family members, including a sister, which IG would legally be to mother after the maternal grandparents adopted her. The concern was that MDOC would learn of the termination of parental rights proceeding and strictly interpret its policy to prohibit visitation between IG and mother despite the creation of a different legal relationship between mother and IG through the adoption.

In May 2024, at another review hearing scheduled for mother, father was present via Zoom. Father did not have an attorney and had not been named as a respondent in the petition because mother had yet to sign the AOP to establish him as IG's legal father. Instead, father was a putative father without legal rights. Even so, the court appointed counsel for him and arrangements were made to have mother sign the AOP in person during a prison visit.

After mother finally signed the AOP in July 2024, DHHS prepared a court report reflecting that scheduling visits with a prison involved a six-week long process and that visits could occur if there was availability. The caseworker documented that she had begun the application process.

Both mother and father were present for an August 2024 hearing with their attorneys. Father's attorney reported that father wanted IG's maternal grandparents to adopt her and asserted that there was no need for DHHS to file a petition because father would release his parental rights. Mother was also ready to release her parental rights; however, if father proceeded to termination, she wanted to release her parental rights after his termination hearing.

The court ordered DHHS to file a petition as to father. Regarding mother, the court changed the permanency planning goal to adoption, scheduling a hearing in October 2024 for both mother and father to release their parental rights. The court's order also noted that parenting time was "currently not permitted" by the facilities where mother and father were incarcerated.

During the October hearing, father opted not to release his parental rights. In turn, mother decided that she would not release her parental rights until father released his parental rights.

In January 2025, the scheduled hearing could not proceed because neither mother nor father was present due to an issue with the writs of habeas corpus prepared to secure their attendance. Likewise, when the February 2025 hearing as to mother began, neither mother nor father was

-3-

present. Further, DHHS had not filed a petition naming father as a respondent. Eventually mother arrived for the hearing and remained steadfast that she would not release her parental rights until father's parental rights were resolved.

The court's post-hearing order reflected that DHHS had offered services to IG's parents, but they were "unable to take advantage of the services due to" their incarceration. Moreover, "[p]arenting time" for the parents was "currently not permitted by" the facilities where they were incarcerated.

In March 2025, an adjourned preliminary hearing was scheduled for father. Because DHHS still had not finalized the petition, this hearing could not proceed.

On April 4, 2025, DHHS finally filed a supplemental petition, requesting termination of both parents' rights to IG. As to father, the petition alleged that he had not provided any financial support for IG due to his ongoing incarceration for the second-degree murder conviction and that his earliest release date was in 2059. DHHS asked the court to determine that there were statutory grounds for jurisdiction under MCL 712A.2(b), statutory grounds for termination under MCL 712A.19b(3)(a)(*ii*), (g), (h), (j), and (m)(*i*), and that it was in IG's best interest to terminate father's parental rights.

Eleven days later, the court held a preliminary hearing on the supplemental petition for father. Father waived the reading of the petition as well as the probable cause hearing. Father requested a bench trial on the statutory grounds for jurisdiction. The court authorized the petition for filing with an amendment.

During the May 2025 pretrial for father, father's attorney said that father's preferred goal was guardianship rather than adoption. Father's attorney urged the court to put the pretrial over until father's criminal appeal was addressed. Although father's attorney observed that father was "very happy" with IG's placement with her maternal grandmother because it was "the best place for" her, father opined that he was "pretty confident" his appeal of his criminal convictions would be successful. The court declined to adjourn the matter and set a trial date after father opted to have a bench trial on the question of whether there were statutory grounds for the court to exercise jurisdiction over IG.

In October 2025, on the date set for the bench trial, father's counsel again asked for an adjournment given the possibility that an appellate court might reverse father's criminal convictions, which served as the basis for DHHS's termination request. IG's guardian ad litem opposed father's request to adjourn the proceedings because IG needed permanency. The trial court denied father's adjournment request because the case had been pending for over three years.

Thereafter, DHHS's counsel opted to pursue termination of father's parental rights under MCL 712A.19b(3)(h) and (m)(*i*).[5] Father argued for guardianship in light of his pending appeal.

---

[5] In pertinent part, MCL 712A.19b(3) provides:

The current foster care worker then testified that she had been the worker since February 2025. She had not observed any bond between IG and father; however, she opined that IG had a strong bond with her maternal grandparents, having been placed with them since April 2024. IG's maternal grandparents were willing to adopt IG and IG's mother agreed with that plan. Although father expressed a preference for guardianship with the maternal grandparents, he knew that IG was in a safe placement. Moreover, IG's maternal grandparents were aware that they could request guardianship over IG. But they wanted to provide permanence through adoption and allow IG to decide whether to interact with her incarcerated parents when she was of age. In fact, the caseworker reported that the maternal grandparents intended to continue to bond with father and his family even after they adopted IG.

Nevertheless, the caseworker was unaware whether the maternal grandparents had facilitated any phone contact between IG and father. Nor did the caseworker contact father's prison to learn whether there could be phone contact between IG and father because the court's August 15, 2024 order reflected that the prison did not allow visitation.[6] The caseworker did not know why visitation was not permitted, but she did not attempt to arrange it. Nor did the caseworker inquire whether the prison could arrange video calls between father and IG; however, she later testified that MDOC's policy prohibited in-person visits, video visits, and telephone calls until IG turned 18. Regardless, father had seen IG during court hearings, and the maternal grandparents had a JPay account and sent father pictures periodically.

The caseworker affirmed that "there are no case service plans" for father. Specifically, father did not have video visits with IG, meaning he never had an opportunity to bond with her. In fact, the caseworker had spoken with prison personnel, who advised that services were not provided until a prisoner was closer to their release date. Given father's 37-year minimum sentence, no MDOC services were yet available to him. Outside of the case service plan, father reported participating in church.

The caseworker also testified that father was unable to care for IG's wellbeing. On the other hand, IG's maternal grandparents wanted to adopt her and could meet her needs for

---

The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

* * *

(m) The parent is convicted of 1 or more of the following, and the court determines that termination is in the child's best interests because continuing the parent-child relationship with the parent would be harmful to the child:

(*i*) A violation . . . of the Michigan penal code, . . . MCL 750.317 . . . .

[6] The order is a check-box form and reads: "Parenting time of . . . (father) – currently not permitted by facility where he is incarcerated[.]" The court explained that the order's language reflected MDOC's administrative policies that parents convicted of certain crimes could not have visitation. In the court's view, the order's language was not "so much of an order as [it was] an advisory . . . [about] [t]he reason why visits weren't being ordered," i.e., MDOC's policies.

permanency, stability, and finality. The caseworker opined that it would be in IG's best interests to terminate father's parental rights and allow IG's maternal grandparents to adopt her. In contrast, allowing father additional time would not benefit IG and termination of his parental rights should occur now. Indeed, even if father prevailed in his criminal appeal and would be released, the caseworker's recommendation to terminate father's rights would not change. The caseworker further opined that IG had never met father and was not aware that he was her father.

The caseworker also testified that father had told her that his family had sent some gifts to IG on his behalf, including clothes and a blanket to DHHS as well as additional items directly to the maternal grandparents. The paternal grandfather also told the caseworker that he was willing to provide some financial support for IG, but he did not discuss specific amounts. DHHS could not accept money; instead, such arrangements would have to be made between the paternal and maternal grandparents.

Father also did not inform the caseworker about his employment in the prison. Again, even if he had offered money to support IG, DHHS was not permitted to accept it.

Turning to IG's best interests, the caseworker was concerned for IG's safety given the 107 stab wounds inflicted upon the murder victim. She further opined that it would not be in IG's best interest to expose her to such violence or potential danger.

DHHS also admitted the parents' judgments of sentence at the hearing. And the trial court took judicial notice of the transcripts from father's criminal case.[7]

After DHHS rested, father testified that he worked as a law library clerk and a Prisoner Observation Assistant (POA). He earned three dollars for three hours of work and could earn up to $300 per month. Father later recognized that the law library job did not give him many hours and that he earned $40 per month for his work. Also, father had not been paid for his POA work because he had just started that job. Father would be willing to send any money he earned to his parents via MDOC policy; in turn, IG's paternal grandparents could then transfer those monies to the maternal grandparents for IG's support. Father also suggested that his parents send gifts to IG on his behalf. For example, for IG's third birthday, father suggested a puppy; however, because IG did not like puppies, her maternal grandparents purchased a kitten instead. Father never visited with IG when he was in jail. According to father, mother gave him a picture of IG before his criminal trial.

Father believed that the maternal grandparents would continue contact with him, either directly or through his parents, even if his parental rights were terminated. Nonetheless, father did not want his parental rights terminated. Father would agree to a guardianship immediately until his criminal appeal was completed. Father anticipated his convictions being overturned because his actions were justified and there had been a miscarriage of justice. Father further expected that his convictions could be reversed by the end of 2025, and this was his reason for not releasing his

---

[7] During closing argument, after it had rested, DHHS also offered to provide the court with the appellate briefing in the criminal case, explaining that the court would have to take judicial notice of it, and the trial court responded, "Okay."

parental rights. Additionally, father had no protective services history and no other criminal history. Father recognized that IG would be 37 years old when he was first eligible for parole.

In closing argument, father's attorney continued to request an adjournment. He also contended that father could provide support for IG through his prison employment. It was argued that if the maternal grandparents were more than fifty years older than IG, their request for adoption might not be approved. By choosing guardianship, the court would remain in control. And, if father prevailed in his criminal appeal, the court would have terminated his parental rights despite him being "found basically not guilty[.]" Father's attorney further asserted that MDOC's policy prevented father from visiting IG and the inability to bond with IG should not be held against him.

DHHS's attorney argued that father would be incarcerated for 30 years and could not visit with IG until she turned 18 years old, regardless of whether the court opted for adoption or guardianship, unless the appellate courts overruled MDOC's "safety policies[.]" And, in any event, adoption was in IG's best interest because it would give IG stability. IG's guardian ad litem concurred.

The trial court determined that it had statutory grounds to take jurisdiction over IG under MCL 712A.2(b)(1) and (2) because father left her without proper custody or guardianship and his criminality made his environment unfit for her. The trial court also determined that father's term of imprisonment would deprive IG of a normal home for a period exceeding two years, that father had not provided for IG's proper care and custody, and that there was no reasonable expectation that he would be able to provide proper care and custody within a reasonable time considering IG's age. The trial court further determined that termination was in IG's best interests. The trial court recognized that MDOC's policies prevented father from having a relationship with IG. The trial court explained that it had "pull[ed] the policies," and because father had been convicted of an assaultive crime, father was not allowed to visit with IG. The trial court observed that video visits posed "no actual safety risk to" IG. Regardless, in the trial court's view, visitation decisions should be left to a child's custodian rather than the MDOC policy. Further, MDOC's policies prevented father from being able to establish any bond with IG. And father was unable to partake in services due to MDOC's policy of not providing them until a prisoner was closer to their release date. MDOC's policies left the trial court unable to evaluate father's parenting ability. Further, the record contained no evidence of domestic violence, meaning that best-interest factor also could not be evaluated. Nevertheless, given IG's young age, permanency, stability, and finality were important. And due to the length of father's incarceration, IG would be an adult before father was released. This factor weighed in favor of termination as did the advantages of the maternal grandparents' home, IG's wellbeing in their care, and the possibility of adoption. Accordingly, the trial court terminated father's rights under MCL 712A.19b(3)(h).[8]

---

[8] The trial court specifically declined to terminate father's rights under MCL 712A.19b(3)(m)(*i*). Although the trial court found that father had been convicted of murder, it concluded that DHHS did not establish by clear and convincing evidence that termination was in IG's best interests because continuing the parent-child relationship would be harmful to IG.

This appeal followed.

## II. ANALYSIS

Father first argues that the trial court erred in finding that DHHS made reasonable efforts to reunify him and IG in the absence of aggravating circumstances.[9] We agree.

Because father did not challenge DHHS's efforts in the trial court, this issue is not preserved for appellate review. See *In re Atchley*, 341 Mich App 332, 336-337; 990 NW2d 685 (2022). We review unpreserved issues in child-protective proceedings for plain error affecting substantial rights. *In re MJC*, 349 Mich App 42, 47; 27 NW3d 122 (2023). To establish plain error, the party alleging an unpreserved error must show that the trial court committed a clear or obvious error that affected substantial rights. *Id*. at 48. "[A]n error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008). Additionally, the party must also show "the error . . . seriously affected the fairness, integrity or public reputation of judicial proceedings." *In re Walters*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 369318); slip op at 7 (quotation marks and citation omitted).

The Fourteenth Amendment of the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." US Const, Am XIV, § 1. One of the oldest and most essential aspects of the liberty interest protected by the Fourteenth Amendment is "the right of parents to make decisions concerning the care, custody, and control of their children." *In re Sanders*, 495 Mich 394, 409; 852 NW2d 524 (2014). Fit parents are presumed to act in their children's best interests, but the state may, subject to the "minimal procedural protections" required by due process, remove a child from a neglectful parent's custody to protect the child's welfare. *Id*. at 409-410.

When a child is removed from a parent's custody, DHHS has an affirmative duty to make reasonable efforts to reunify the parent and child before seeking termination of the parent's parental rights, unless the court determines that aggravated circumstances exist under MCL 712A.19a(2). See *In re Walters*, ___ Mich App at ___; slip op at 2-7; *In re Sanborn*, 337 Mich App 252, 258-259; 976 NW2d 44 (2021). When aggravated circumstances are not involved, "[DHHS] must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Sanborn*, 337 Mich App at 259 (quotation marks, citation, and alteration omitted).

Even if a parent is incarcerated, DHHS is still required to make efforts to afford the incarcerated parent a "meaningful and adequate opportunity to participate" in the proceedings. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). Notably, if a parent's incarceration prevents the parent from participating in the service plan as written, then DHHS has an obligation

---

[9] The trial court did not make a finding regarding reasonable efforts on the record, but its order terminating father's parental rights contains a check-box finding that DHHS made reasonable efforts to reunify IG and father.

to update the service plan, *id*. at 157-158, and failure to do so prejudices a parent's fundamental rights, *id*. at 157 n 8. Additionally, termination of parental rights under certain statutory grounds is premature without evaluating whether the parent could personally care for their child in the future or through relative placement. *Id*. at 164-165. And "a child's placement with relatives weighs against termination"; it is an explicit factor to examine in deciding whether termination was in the child's best interests. *Id*.

In this case, although DHHS's supplemental petition alleged the aggravating circumstance of abandonment, MCL 712A.19b(3)(a)(*ii*) and MCL 722.638(1)(a)(*i*), DHHS ultimately opted not to pursue that theory. See MCL 712A.19a(2) and MCL 722.638(1) and (2). Therefore, no aggravated circumstances existed to excuse DHHS from making reasonable efforts. *Id*.

During the termination hearing, the caseworker testified that no case service plan was made for father,[10] that no services were provided to him, and that he had no visits with IG. The caseworker also testified that she did not seek visitation for father but she had called the facility, learning that MDOC would not be providing services to father until he was closer to his release date. The trial court specifically discussed MDOC's history of not allowing visits, even when they were court-ordered. Thus, there is no dispute that MDOC's policies and the circumstances of father's incarceration impacted DHHS's reunification efforts in this case.

Yet, the caseworker did not testify about steps she took to identify services for father or how she tried to adjust father's service plan given his incarceration and MDOC's policy decision not to provide him with MDOC services until he was closer to his release date. Although the caseworker was able to send father mail, there is also no indication in the record that she sent father materials to work on in lieu of more formal services when, "[a]t the very least, the caseworker must provide available workbooks for [a parent] to complete, as has been done in many other cases involving incarcerated parents." *In re Dixon (On Reconsideration)*, 347 Mich App 337, 362; 14 NW3d 497 (2023). See also *In re Mason*, 486 Mich at 157 n 8, 157-158.

Curiously, although the trial court reported that it had reviewed MDOC's policy and confirmed that it prohibited visits with IG, the record below also reflects that there were court-ordered visits for IG and mother, who was also incarcerated. Further, a prior caseworker noted in an updated court report in August 2024, that she had started the application process for prison

___

[10] DHHS disputes this on appeal, providing a copy of an Updated Service Plan and Parent Agency Treatment Plan (PATP) prepared by the caseworker on May 21, 2025, and signed by father on June 14, 2025. This document is not contained in the lower court file. And our review is limited to the record established in the trial court. See MCR 7.210(A)(1); *In re Harper*, 302 Mich App 349, 360 n 3; 839 NW2d 44 (2013). Nevertheless, we recognize that the initial and updated court reports reflect that the caseworker sent father "PATPs." But the action steps DHHS outlined for father in the PATP it provides were that he participate and benefit from his clinical treatment plan in prison, that he participate in and benefit from individual therapy, that he participate in and benefit from any other recommended and available services in prison, and that he utilize skills which he learned in therapy. Again, MDOC provided no services to father due to the length of his incarceration.

visits. Our own review of MDOC's visitation policy, which was effective on May 5, 2025, shows that it did not prohibit father from visiting with IG, either in-person or by video.[11] In fact, the MDOC policy directive contains a specific process for DHHS employees or privately-run agencies working under a contract with DHHS to facilitate either an in-person or video visit between a prisoner and their child. Again, in this case there were no visits due to the current caseworker's reliance on the court's August 2024 order reflecting that parenting time was not currently permitted by the facility.

On this record, DHHS failed to make reasonable efforts to reunify IG with an incarcerated father by navigating MDOC policy to arrange in-person or virtual visits between father and IG and provide father with services that he could actually participate in and benefit from.[12] Accordingly, the trial court's finding that DHHS made reasonable efforts at reunification in this case was plainly erroneous. See *In re Walters*, ___ Mich App at ___; slip op at 7; *In re MJC*, 349 Mich App at 48; see also *In re Mason*, 486 Mich at 157-158.

We also conclude that this error affected father's substantial rights because "it is unclear how an aggrieved respondent could establish outcome determinative error concerning the denial of reunification services altogether" when "the error improperly dispensed with a critical aspect of a child protective proceeding—the requirement to offer reunification services before terminating parental rights—affected the very framework within which this case progressed, undermined the foundation of the rest of the proceedings, and impaired respondent's fundamental right to direct the care, custody, and control over [his] children." *In re Walters*, ___ Mich App at ___; slip op

---

[11] See DOC Policy Directive 05.03.140 <https://www.michigan.gov/corrections/-/media/Project/Websites/corrections/Files/Policy-Directives/PDs-05-Institutional-Placement-and-Programs/PD-0503-Programs-and-Leisure-Time-Activities/05-03-140-Prisoner-Visiting-effective-12-02-19.pdf?rev=49239cb639e0408596183997cbf12706> (accessed August 3, 2026).

[12] Our Supreme Court has explained the elements necessary to terminate a parent's rights under MCL 712A.19b(3)(h):

> The combination of the first two criteria—that a parent's imprisonment deprives a child of a normal home for more than two years and the parent has not provided for proper care and custody—permits a parent to provide for a child's care and custody *although the parent is in prison*; he need not *personally* care for the child. The third necessary condition is forward-looking; it asks whether a parent "will be able to" provide proper care and custody within a reasonable time. Thus, a parent's past failure to provide care because of his incarceration also is not decisive. [*In re Mason*, 486 Mich at 161 (footnotes omitted).]

Recognizing that DHHS could not secure father's release from prison to personally reunify him with IG, the law allows an incarcerated parent to "fulfill his duty to provide proper care and custody in the future by voluntarily granting legal custody to his relatives during his remaining term of incarceration." *In re Mason*, 486 Mich at 163. And, in this case, there is an open question as to whether father could fulfill his duty to provide proper care and custody of IG within a reasonable time considering her age via a guardianship with one of her paternal grandparents or another fit relative.

at 7 (quotation marks and citation omitted). Certainly, "the fairness and integrity of the proceeding was seriously affected by the damage done to the framework in which the case progressed." *Id*.

Because father met his burden of establishing that plain error occurred and that he was prejudiced, we vacate the trial court's order terminating father's parental rights and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Michael J. Riordan
/s/ Anica Letica